JESSE SNEAD, LATE HIGH SHERIFF OF HENRICO COUNTY, AND AS SUCH, ADMINISTRATOR DE BONIS NON OF ALBERT SEEKAMP, DECEASED, APPELLANT, v. JULIA M'COULL, WIDOW OF NEIL M'COULL, CHARLES L. M'COULL, ADMINISTRATOR DE BONIS NON OF NEIL M'COULL, AND THE SAID CHARLES L. M'COULL, MARY P., JULIA L., AND JOHN JAMES M'COULL, HEIRS OF NEIL M'COULL, WILLIAM SELDEN, AND EDMUND CHRISTIAN, MARSHAL OF THE EASTERN DISTRICT OF VIRGINIA ET AL.

Prior to the Revised Code of Virginia in 1819 the lien created upon land by a judgment was the same as in England. In both countries the following rules prevailed:

1. That the lien of the judgment resulted entirely from the right of the plaintiff to sue out an *elegit*, and charge the goods and the moiety of the lands of the debtor.

2. That the election so to charge them by an *elegit* executed, discharges from liability the body of the defendant and the remaining moiety of the lands.

3. That the *capias ad satisfaciendum* executed, is, *pro tanto*, a satisfaction of the judgment which releases *proprio vigore* any previous lien upon the lands, and inhibits all recourse against the goods and chattels or lands of the debtor, with the exceptions of the instances of death whilst charged in execution, or of an escape from prison, or a rescue.

A discharge under the act of Congress for the relief of persons imprisoned for debt (2 Stat. at Large, 4, sec. 2,) did not restore the lien originally created by the judgment, and waived by issuing a *ca. sa.*

In 1819 the State of Virginia revised her code. By a part which went into operation on the 1st January, 1820, it was enacted that, thereafter, the issuance of a *ca. sa.* should constitute a lien upon lands.

But as it did not relate to past liens, the purchaser of a lien created under the Revised Code had a good title when compared with a claimant under the lien which existed in 1817, but which had been waived by issuing a *capias ad satisfaciendum.*

After a case had been argued and was under advisement, a motion to permit the complainant to file a further bill by way of supplement and amendment, which would have made an essential change in the character and objects of the cause, was properly overruled in the Circuit Court.

THIS was an appeal from the Circuit Court of the United States for the Eastern District of Virginia

The facts in the case are fully set forth in the opinion of the court.

.It was argued by *Mr. Johnson,* for the appellant, and *Mr. Robinson,* for the appellee.

*Mr. Johnson* said, that prior to 1819, the right to issue an execution was governed by the law of 1748 ; but in 1819 the Revised Code directed that a *capias ad satisfaciendum* created a lien upon land from its date. Before that, the law was the same as in England. The decree below rests upon the principle that the lien is destroyed by a *ca. sa.* But it is not so where the debtor dies in custody or escapes. The reason is, that if the debtor is taken from prison by a cause over which the creditor has no control, then the creditor does not suffer, but may resort to another execution.

If then he is discharged by an act of Congress, the same reason operates, and the creditor should not lose his lien. The second section of the act (2 Stat. at Large, 4, sec. 2,) expressly says that the judgment shall remain and be in full force. Note 68 Williams's Saunders, where the cases are collected. 2 Leigh, 257 ; 4 Id. 425. These cases say that the English rule is the Virginia rule.

The point made by *Mr. Robinson,* upon which the decision turned, was the following :

Under the judicial act of 1789, sect. 14, (1 Story's Laws U. S. 59,) as expounded in Wayman *v.* Southard, 10 Wheat. 24, the courts of the United States have power to issue writs of execution on their judgments; and under the process acts of 1789 and 1792, (1 Story's Laws U. S. 67, 257,) the forms of executions and the forms and modes of proceeding in suits at common law, including (according to the decisions in Wayman *v.* Southard, 10 Wheat. 32, and Duncan *v.* Darst, et al. 1 How. 306,) the conduct of the officer in the execution of the process, whether *mesne* or final, and all the regulations and steps incident to it from its commencement to its termination, are to conform to the law of the State as it existed in September, 1789, so far as that law can be made to apply.

The Virginia act of 1748, concerning executions, (5 Hen. Stat. 526,) which as to this matter was the law of the State in 1789, recognizing that persons recovering judgments, may, at their election, prosecute writs of *fieri facias, elegit,* and *capias ad satisfaciendum* for taking the goods, lands or body, and prescribing the form of a writ of *elegit* as well as of other writs, it is not controverted that Seekamp's administrator might in the first

instance have sued out an *elegit*, and according to the terms and effect of that writ, have extended a moiety of all the lands of which M'Coull was seized at the date of the judgment, or at any time after. But having made his election to take out a *ca. sa.* in the first instance, (as he had a right to do both under the Virginia act and the proviso to the process acts,) and having pursued the *ca. sa.*, we insist — That the plaintiff has no longer the capacity to sue out an *elegit*, and no longer a lien from the date of his judgment on a moiety of the real estate of M'Coull, or any part thereof. 3 Bac. Abr. 393, 394, of Lond. ed. of 1832; 2 Wms. Saund. 68 *b;* Shaw v. Cutteris, Cro. Eliz. 850; Williams v. Cutteris, Cro. Jac. 136; Id. 143; Foster v. Jackson, Hob. 59, (which three cases were decided after Blumfield's case, 5 Rep. 174); Lord Ellesmere's Observations on Coke, p. 18; Stat. of 21 Jac.; Burnaby's case, 1 Str. 663; *Ex parte* Warder, 3 Brown's Ch. Rep. 191; *Ex parte* Cater, 3 Brown's Ch. Rep. 216; *Ex parte* Knowell, 13 Ves. 193; 5 Hen. Stat. p. 531, sects. 3, 4, 5, 6, 7, 8, 9; Id. p. 539, sects. 27, 28; Willson v. Jackson, 5 Leigh, 102; 8 Hen. Stat. p. 329, sect. 8, 9; Bullock v. Irvine's Adm'rs, Munf. 450; Shirley v. Long, 6 Rand. 735; 1 Rev. Code of 1819, p. 528, sect. 10; Jackson v. Heiskell, 1 Leigh, 257, 260, 261, 275, 276; Foreman v. Loyd, 2 Leigh, 284, 296, 298; Beverly v. Brooke, 2 Leigh, 445; 2 Tuck. Com. 345, 358, 373; Rogers, &c. v. Marshall, 4 Leigh, 425, 431, 432, 435; Leake v. Ferguson, 2 Gratt. 432; 1 Lomax's Dig. 302; Beers v. Houghton, 9 Peters, 362; Duncan v. Darst, &c. 1 How. 309; 1 Story's Laws U. S. 716; Bank of U. S. v. Weisiger, 10 Pet. 353; United States v. Stansbury, &c. 1 Pet. 573; Tayloe v. Thomson, 5 Pet. 367, 368, 369; United States v. Morrison, 4 Pet. 124. Hayling v. Mullhall, 2 W. Bl. 1235; Eng. Insolvent Act of 7 Geo. 4, ch. 57, sect. 61, Evans's Stat. p. 193, ll.; Collins v. Benton, 2 Man. & Grang. 861; 40 Eng. Com. Law Rep. 663; Freeman v. Ruston, 4 Dall. 214, Jackson v. Benedick, 13 Johns. 533.

Mr. Justice DANIEL delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States from the Eastern District of Virginia, dismissing the bill of the appellant who was plaintiff in that court.

On the 3d of December, 1814, Seekamp's administrators recovered a judgment in the Circuit Court of the United States for the Eastern District of Virginia, against Neill M'Coull, for $5,688 damages and costs. In February, 1817, this judgment was affirmed with costs, and damages at the rate of six per centum, for which the Circuit Court gave judgment accordingly, in May, 1817 when the mandate was

On the judgment a *ca. sa.* issued the 29th of July, 1817, which was returned executed upon M'Coull, and a bond taken, with condition that he should remain within the bounds of the Superior Court of Henrico county. This admission to the jail limits seems to have been under the act of Congress of January, 6, 1800, (2 Stat. at Large, 4,) expounded in United States *v.* Knight, 14 Pet. 316. See 13 Hen. Stat. p. 373, sect. 37, and 1 Rev. Code of 1819, p. 535, sect. 30.

In what way M'Coull got back into the custody of the marshal does not clearly appear; and perhaps it is not material. He seems while imprisoned to have petitioned to have administered to him the oath prescribed by the act of Congress, for the relief of persons imprisoned for debt. The oath was administered on the 18th of July, 1821, and M'Coull then discharged from his imprisonment on this judgment.

Although this proceeding was under the act of Congress, which has no provision requiring a conveyance from the debtor, a deed seems to have been executed by M'Coull, under the idea that the State law in 1 Rev. Code of 1819, p. 537, was in some way to be applied to the case. The deed is to John Pegram, then marshal of the Eastern District of Virginia, and conveys to him and his successors in office, to be disposed of according to law, such interest as M'Coull, on the day of his discharge, had in any lands or other property; stating, however, on the face of the deed, that all the property had theretofore been conveyed by deeds of record.

It appears that on the 20th of September, 1812, a tract of land in Henrico, known by the name of Marion Hill, was conveyed by Walter Shelton, as commissioner, to M'Coull, and by M'Coull to John Parkhill as trustee, to secure the purchase-money. M'Coull paid to Shelton the money secured by this deed of trust, but failed to get a deed of release from Parkhill.

Between June, 1814, and December, 1817, M'Coull sold, and by deeds of bargain and sale conveyed, to individuals, certain lots which were part of the Marion Hill tract.

M'Coull died intestate, leaving a widow, Julia, and five children, to wit: Ann, Charles L., Mary P., Julia L., and John J., the three last of whom were infants when this suit was brought.

On the 19th of February, 1829, by an agreement under seal, the widow and two eldest children of M'Coull, in consideration of $1,000, transferred and surrendered to William Selden, a certain part of the Marion Hill tract; it being agreed that if they should within six years make to Selden a good title, he should in addition pay to them, or their order, $20 for each acre to which

such good title should be made, and if within the six years they should not make him a good title, then they were to surrender all right of property as well as possession.

On the 14th of September, 1829, a deed of release was made from Parkhill and Shelton, (the parties to the deed of trust of the 20th of September, 1812,) to Selden, which, after reciting Selden's purchase of part of the Marion Hill tract, (supposed to be of 100 acres,) and the desire of the widow and heirs that a deed of release should be executed to Selden for that part, contains a full release of the legal title from Parkhill to Selden.

About 14 years after, M'Coull was discharged as an insolvent, to wit: in May, 1835, Seekamp's administrators filed their original bill, claiming that by their judgment they acquired a lien upon the lands of M'Coull; alleging that of the land purchased from Shelton a considerable portion remained in M'Coull's possession unsold at the date of the deed to Pegram, "which by the provisions of the said deed was subjected to the payment of the said judgment;" charging that Selden purchased with knowledge of the said judgment and of the deed to Pegram, given to secure it; that Selden knowing from the situation of the affairs of M'Coull, and the lien of the plaintiffs, that no good title could be made him by the widow and heirs of M'Coull, did in fact pay them a very trivial consideration for the said 100 acres, compared with the full value thereof; and claiming that they have a valid subsisting lien upon the said 100 acres, and that the same should be applied in satisfaction of their judgment.

The bill also mentions certain lands sold and conveyed by Bartlett Still to M'Coull, states that these lands remained in M'Coull's possession till his death, and claims that they are liable under the deed to Pegram to satisfy said judgment.

The plaintiffs further claim that they have a right to subject all the other lands and property conveyed in said deed executed for their benefit, to the satisfaction of said judgment in whatever hands they may be found, as said deed operated to bind the property thereby conveyed, from the date of its admission to record.

The bill makes defendants, the widow, heirs and administrators of M'Coull, William Selden, and Edmund Christian, the successors (as marshal) of John Pegram, and besides asking certain discoveries, prays the court to decree a sale of the said 100 acres of land conveyed Selden, and the two parcels conveyed by Still to M'Coull, and whatever land or other property, subject to the debt of Seekamp's administrators, may have descended or come to the hands of the widow and heirs of M'Coull, and that so much of the proceeds of said sale as may be necessary

to pay off and discharge said judgment with interest and costs, may be applied in satisfaction thereof.

Selden alone filed answer. In this answer he insists that by the deed of September 14, 1829, from Parkhill and others, the legal title is vested in him, and states, that being aware of many outstanding incumbrances upon the equitable right, he has endeavored to take in those incumbrances which gave preferable liens.

The answer of Selden sets forth amongst other incumbrances prior in time to the deed to Pegram, one created by a judgment of Taylor and Hay rendered in their favor in April, 1821, in a State court of Virginia, against M'Coull, and a *ca. sa.* levied on his body the 28th of April, 1821, under which he was discharged the 21st of July, 1821, by taking the oath of an insolvent debtor; and states that Selden, being advised that this execution of *ca. sa.* being levied after the 1st of January, 1820, when the act in the 1st vol. of Rev. Code of 1819, p. 528, sect. 10, commenced, bound the real estate of M'Coull from the time when it was levied, obtained an assignment of this judgment from the representatives of William Dandridge, for whose benefit the judgment was obtained. This lien being prior to the date of the deed to Pegram, under which the plaintiffs claim, he insists has preference over their claim.

He insists that the lien of the plaintiff's judgment was extinguished by the levy of his execution on the body of M'Coull, and that the plaintiff can have no other lien on the property of M'Coull, except the deed made to Pegram. That amongst the deeds made by M'Coull prior to that last mentioned, was one bearing date on the 26th day of May, 1814, and another on the 2d of January, 1821, for the benefit, amongst others, of the wife of M'Coull, in consideration of the relinquishment of her dower in the property of her husband, sold and aliened by him; which deeds, as Selden claims also under the widow and heirs of M'Coull, he insists should enure to his protection against the claim of the plaintiff. After this answer an order was made June 6, 1836, giving leave to the plaintiff to amend his bill. Nothing was done under this leave for six years, viz.: until June 9th, 1842, when a bill of revivor was filed in the name of the administrator *de bonis non*, of Seekamp against Charles L. M'Coull, administrator of Neill M'Coull. By an order made on the 19th of December, 1843, it is stated that the suit was abated as to the widow of M'Coull, and that the plaintiff had by leave, on that day filed an amended bill, making defendants, the representatives of Dandridge, for whose benefit the judgment in favor of Taylor and Hay had been rendered and that those representatives had filed their answer.

This answer insists that the lien of the representatives of Dandridge (claiming through Taylor & Hay) is preferable to that of the plaintiff; that the plaintiff, by taking his *ca. sa.*, released the lien of his judgment, and can claim only by force of the surrender made by M'Coull when he took the insolvent oath; the *ca. sa.* of Taylor & Hay levied the 28th of April, 1821, constituted (by force of the statute of Virginia) a lien on lands from the time of levy, which gave their claim a priority over that of the plaintiff; that moreover, Taylor & Hay (and in their stead the representatives of Dandridge) have a right to be substituted for James Carter and John M'Coull, (sureties for Neill M'Coull to Taylor & Hay,) for whose benefit there was executed a deed of the 10th of January, 1821.

The cause was argued at the May Term of 1846, and the court took time to consider;. at the June rules of the court in 1848, a notice was issued by Seekamp's administrator, that he would apply for leave to file an amended and supplemental bill, which application-being opposed on the part of Selden and of those who had become some time previously purchasers from him, the court on the 7th of June, 1849, after hearing the petition and the objections made thereto, refused leave to file the proposed bill either as an amended or supplemental bill, and decreed that the bill of the complainants be dismissed with costs.

The important question upon this record and that upon the determination of which the decree of the Circuit Court should be affirmed or reversed, is a question of priority between these parties, growing out of their respective acts and the legal consequences flowing from those acts, with reference to the subject claimed by them both, as having been once the property of Neill M'Coull, from whom the rights of both parties are deduced. For the appellant, it is insisted, that by operation of his judgment in May, 1817, the levy of his *capias ad satisfaciendum* on that judgment in July of the same year, and the discharge from custody of M'Coull under the insolvent law of the United States, and his deed at the time of that discharge to Pegram the marshal, there was created a lien in behalf of the appellant on all the property held by M'Coull, including the land purchased by the defendant Selden, creating a priority in favor of the appellant which neither the acts nor the rights of Selden, nor of others deriving title from M'Coull subsequently to the judgment, execution, and deed above mentioned, could divest. On behalf of Selden and those whom he is intrusted to protect, it is contended, that whatever might have been the capacity of the appellant's judgment to bind the lands of M'Coull from the date of the judgment, by a proceeding under it such as would have been

35 *

proper to maintain and enforce that lien, yet by the election of the appellant to take the body of M'Coull and to retain him in custody from 1817 to 18th of July, 1821, the lien of the judgment was released, and *quoad* all property of the debtor at the date of the judgment could be revived by one of two events only, viz., the escape of the debtor from prison, or his death whilst in custody, the occurrence of neither of which events is pretended. That the act of Congress under which M'Coull was discharged as an insolvent debtor, created or preserved no specific lien, and the deed to Pegram could have no such effect, and conveyed, if any thing, only such interest as M'Coull possessed at the date of that deed, the deed itself declaring by its terms, that all the property of M'Coull had been theretofore conveyed by prior conveyances of record. That by the acquisition of the legal title to the land in dispute from Parkhill, to whom the legal title had been conveyed by M'Coull, three years anterior to the judgment against him by the appellant and the purchase by Selden, of the widow and heirs of M'Coull, and the assignment to him of the lien created by the judgment in favor of Taylor & Hay, against M'Coull, and the discharge of the latter under a *capias ad satisfaciendum* sued on that judgment and executed on the 28th of April, 1821, previously to the deed to Pegram, Selden had obtained a complete title to the land in question, which could not be overreached or affected by the judgment of the appellant. The truth or the incorrectness of the positions assumed by these parties respectively, must be settled by a proper construction of the laws of the State within which the land in dispute is situated, and within which all the proceedings referred to have occurred.

By the decisions of the highest tribunal in Virginia, the law of that State, prior to the statute of 1819, with respect to the lien of judgments, has been expounded in very close conformity with the common and statute law of England, from which it appears to have been adopted. Thus we find it laid down by compilers and by commentators upon the law of England, that the lien of judgments upon lands in that country was created by the Statute *de mercatoribus*, also styled the Statute of Acton Burnell, 11th of Ed. 1st, and by the Statute of Westminster 2d, 13th Edward, 1st Cap. 18, by the latter of which statutes the writ of *elegit* was given by enacting, that " he who recovereth in debt or damages, may have either a *fieri facias* of the chattels of the debtor, or a writ on which the sheriff shall deliver to him all the chattels of the debtor, saving only his oxen and beasts of the plough, and half of his land, until the debt be levied upon a reasonable price or extent." Vid. Bacon's Abridg. tit. Execution A, referring to the statutes above mentioned, and citing Hobart, 60, and 2 Roll. Abr. 475.

Snead *v.* M'Coull et al.

It is said by Bacon, on the authority of Dalton's Sheriff, 144, that the statute of 25th Ed. 3 Cap. 17, subjected the person of the debtor and gave the *capias ad satisfaciendum* against him in debt, detinue, &c., in the case of a common person, though by this same compiler, it is said, that doubts have been suggested down to a period as late as the time of Lord Mansfield, as to the mode by which a proceeding existing at common law confessedly in behalf of the king alone, and affecting so gravely the personal liberty of the subject, had been placed at the discretion of private persons. Leaving these questions concerning the remote origin of the different modes of final process, as belonging peculiarly to the province of the antiquary, we proceed so far as is necessary for the decision of the case before us, to ascertain the effect of them as settled by judicial interpretation in England, and in the jurisprudence of Virginia, upon which by custom and by statutes they may have been ingrafted. The force and operation of these different modes of final process in England in reference both to the parties resorting to them and to those on whom they are brought to bear, will be seen under the several divisions of the title Execution in the 3d vol. of Bacon. They have also been traced with his characteristic perspicuity and method by Mr. Justice Blackstone, from p. 414 to p. 421 of the 3d vol. of his commentaries, Chap. 26. In 3d Bacon Abr. Execution D. p. 392, the law is thus stated, "when the plaintiff has judgment he has it in his election to sue out what execution he pleases; but he cannot regularly take out two different executions on the same judgment nor a second of the same nature unless upon failure of satisfaction of the first. Therefore, if the plaintiff upon a judgment or recognizance at common law sues out an *elegit,* he can have no *capias ad satisfaciendum* afterwards to take the body, because he hath determined his choice by that writ to the goods and chattels and a moiety of the land, which being entered upon the record, he is thereby estopped, and though he takes but an acre of land in execution, yet it is held a satisfaction of the debt, be it never so great, because in time it may come out." The exceptions to this restriction on the plaintiff's right to another execution, are the return of *nihil* on the first, and the return by the sheriff that he hath levied only on the goods of the defendant; because the plaintiff being entitled to levy on the land also, should not be precluded from the benefit conferred by the statute. But if the land be delivered, though of never so little value, that will be a bar, for the sheriff hath delivered the moiety of the land according to the statute. For this are cited, Bro. Elegit; 15 Roll Abr. 896; Hob. 57; 5 Leon. 87; 2 Bulst. 97, and other authorities. In conformity with the law as just stated, is the doctrine of Mr. Justice Blackstone, who

concludes his remarks upon this subject in the following words, vol. 3d, p. 419: " This execution or seizing of lands by *elegit* is of so high a nature, that after it the body of the defendant cannot be taken, but if execution can only be had of the goods because there are no lands, and such goods are not sufficient to pay the debt, a *capias ad satisfaciendum* may then be had after the *elegit*, for such *elegit* is in this case no more than a *fieri facias*, so that body and goods may be taken in execution, or lands and goods ; but not body and land too, upon any judgment between subject and subject in the course of the common law." The origin and effect of the *elegit* have been thus dilated upon, as proper to define the foundation and effect of the lien of a judgment upon lands, to show that it mounts no higher than the *elegit* itself, or the capacity of the judgment creditor to resort to that process, and that where such capacity was wholly taken away or suspended, the lien was affected in the same degree. With regard to the effect of the *capias ad satisfaciendum* upon the rights of the parties to a judgment, we are told by Blackstone, vol. 3d, p. 415, that " the writ of *capias ad satisfaciendum* is an execution of the highest nature, in as much as it deprives a man of his liberty till he makes the satisfaction awarded, and therefore, when a man is once taken in execution upon this writ, no other process can be sued out against his lands or his goods."

So in 3d Bac. Abr. tit. Execution D. p. 395, it is said : " It was formerly held, that if a person taken on a *capias ad satisfaciendum* died in execution, the plaintiff had no further remedy, because he had determined the choice by this kind of execution, which, affecting a man's liberty, is esteemed the highest and most rigid in the law, and for this are cited Foster *v.* Jackson, Hob. 52 ; Williams *v.* Critteris Cro. Jac. 136 ; and Rolt Abr. 903 ; and it has been ruled that if the plaintiff consent to the defendant being discharged out of execution upon an agreement, he cannot afterwards retake him, although the security given by the defendant on his discharge should afterwards be set aside; vid. 4 Burr. 2482 ; 1 T. R. 557 ; 2 East, 243. **And** as late as 1806 the following language is held by the Lord Chancellor in the case, *ex parte* Knownell, 13 Ves. 193. " Considering the bankruptcy out of the case, it is clear that by the taking the body in execution the debt is satisfied to all intents and purposes. If the debtor being in execution becomes a bankrupt, the creditor, in reason and justice, must have a right to elect; not having contemplated that event, which deprives him of the fruit of his execution. But when the commission has previously issued, and the creditor therefore takes his execution, apprised of the disposition to be made of the effects, and that there may be a

certificate and has his choice, that step. upon the same reason must be an election, and the debt is satisfied, whether by payment or by having the body in execution is not material." The only known exceptions to the effect of the *capias ad satisfaciendum* executed are, 1st, the provision of the statute of 21st Jac., 1st. Cap. 24, that if the defendant shall die while charged in execution, the plaintiff may, after his death, sue out a new execution against his land, goods, or chattels; and the instances of an escape or rescue of the party taken in execution; in which two last instances it has been ruled, that although the sheriff is thereby liable because he ought to have taken the *posse comitatus*, yet the plaintiff may take out any new execution, and shall not be compelled to take his remedy against the sheriff, who may be dead or insolvent.

From this view of the law, as ruled by the English courts, the following points may be considered as conclusively ruled in that country: 1st. That the lien of the judgment results entirely from the plaintiff to elect to charge the goods and the moiety of the lands of the debtor. 2d. That the election so to charge them by an *elegit* executed, discharges from liability the body of the defendant and the remaining moiety of the lands. 3d. That the *capias ad satisfaciendum* executed, is *pro tanto* a satisfaction of the judgment, which releases *proprio vigore* any previous lien upon the lands, and inhibits all recourse against the goods and chattels or lands of the debtor, with the exceptions of the instances of death, whilst charged in execution, or of an escape from prison, or a rescue.

Recurring now to the laws of Virginia, upon these same subjects, we find as early as the year 1748 (22 George II.) the statute of the colonial legislature beginning with the following preamble: " Whereas by the common law of England and divers acts of Parliament, which are binding upon the subjects of this colony, all persons recovering any debt, damages or costs, by the judgment of any court of record, may, at their election, prosecute writs of *fieri facias, elegit,* and *capias ad satisfaciendum* within the year, for the taking of the goods, lands, or body of persons against whom such judgment is obtained, to the end the said several writs issuing out of any of the courts of record within this dominion, and the manner of executing and returning the same may be uniform, and the mischiefs arising from incorrect forms and insufficient returns of such writs prevented, Be it enacted, &c." The first thing which strikes the attention in reading this preamble is not only its explicit recognition of the common law and statutes of the mother country, with respect to the binding force and operation of judgments, but also of the modes, and the effect of those modes, as they were known in the mother

country, to be carried into operation. Thus it is declared that there shall be a *fieri facias* for taking the goods—an *elegit* for taking the lands, and a *capias ad satisfaciendum* for taking the body of any person against whom such judgment is obtained. Not only are these forms of proceedings adopted with the import which their mere terms might convey, but they are adopted with direct reference to the common law and statutes of England, (and of course to the judicial interpretations of the law) as decisive of their operation and effect. The statute then proceeds to prescribe the forms of these several writs, and the returns to be made upon them, following, it is believed, literally, the forms in the courts of law in England, with such exceptions only as the difference in situation and the style of the courts rendered indispensable; and in the 3d and 4th sections enacts the provisions contained in the stat. of the 21st of James I., Cap. 24th, authorizing the renewal of execution against the lands and goods of a debtor dying in execution; and protecting the title of purchasers from the prisoner to lands *bonâ fide* sold by him for the payment of any of his creditors, at whose suit he shall have been in executio), and the money paid or secured, to be paid to such creditors with their privity in discharge of his debts, or some portion thereof. The construction of this statute, which, up to the revisal of the laws of Virginia made in 1819, and going into effect in 1820, controlled the question of judgment lien, and the rights of purchasers from a debtor in execution is understood to be definitively settled, and to have established the rules in the State in conformity with the doctrine of the English courts, that the lien of a judgment depends entirely on the right or capacity of the plaintiff to sue out an *elegit*, and that by electing a *capias ad satisfaciendum*, the lien of the judgment is so far destroyed as to be inoperative, except in the instances of death in execution, and of an escape. Indeed, the provision in the statute of 21st James I., and in the Virginia act of 1748, which protect *bonâ fide* sales by debtors in execution, are wholly inconsistent with the idea of a continuation of a judgment lien during the operation of a *capias ad satisfaciendum* executed, for the lien of a judgment, is a legal lien commencing and coeval with the judgment itself, and unless released by charging the debtor in execution, would by its own force and effect go back to the date of the judgment, and override all *mesne* alienations or rights of every description. But this part of the Virginia statute of 1748 has been clearly expounded by the Supreme Court of Virginia, in the case of Bullock v. Irvine's administrators, reported in 4 Munford, 450, which was a suit brought to vacate a sale made by a debtor in execution to one of his creditors, and which sale the Chancellor had decreed to be void as to creditors

under the laws of the State concerning executions. The Supreme Court, in reversing the decree of the Chancellor, uses this language: "That instead of the decree rendered by the Chancellor in this case, he ought to have directed an issue, to try what was the amount of the consideration which passed from the said Hannah Bullock to James Bailey (the debtor in execution) for the land in question, and whether there was any secret agreement or understanding between the said parties, that the said land was to be holden by the former for the use and benefit of the latter. The court is further of opinion, that if it shall turn out upon the issue aforesaid, that a reasonable consideration did pass as aforesaid, and that there was no such secret agreement or understanding, that then and in that case the bill of the appellees should be dismissed, the transaction in that view being only the preference of one *bonâ fide* creditor over another." Thus it is seen that the *bona fides* of the transaction, and not the quality or extent of the legal lien, determined the validity of the transaction, for the existence of such a lien would have deprived the debtor of all power of alienation.

In the revisal of the laws of Virginia, made in the year 1819, (going into operation in the year 1820) a provision was introduced by the tenth section of the law concerning executions, declaring that every sale, conveyance, and transfer of any lands or tenements made by any person charged in execution for any debt or damages, shall be absolutely null and void, as to the creditor at whose suit he is so charged in execution, unless such sale, transfer, and conveyance be absolute and *bonâ fide*, and be made for the payment of the debt and damages due to such creditor or creditors; and that all executions of *capias ad satisfaciendum*, levied after the commencement of this act, shall bind the real estate of the defendant from the time when they shall be levied. It has been insisted, that this execution-lien, given by the 10th section of the act of February, 1819, so attaches upon the lands and tenements of the debtor, as to cut out all junior incumbrances by judgment, whilst the debtor remains in execution, although the regular proceedings be had upon such junior judgments to enforce the lien created by them (as judgments) upon the lands of the debtor. The first interpretation given to the 10th section of the statute of 1819, by the Supreme Court of Virginia, was in accordance with the position just mentioned, as will be seen by the case of Jackson v. Heiskill, 1 Leigh, 257. But the case of Jackson v. Heiskill having been decided by a bare *quorum* of the court, and by a bare majority of that *quorum*, the question so determined was reconsidered by a full court, in the case of Foreman v. Loyd, &c., reported in 2 Leigh, 284; and by the court, with the exception of one judge,

the case of Jackson *v.* Heiskill was overruled, and the following interpretation given to the 10th section of the statute of 1819, and to the execution-lien created thereby, namely: That, where several creditors recover judgment and sue out writs of *capias ad satisfaciendum* against the debtor, upon which he is taken and charged in execution; and then another creditor recovers judgment against the same debtor, and sues out an *elegit* on which his lands are extended, and a moiety of them delivered, and then the debtor is regularly discharged from the writs of *capias ad satisfaciendum* as an insolvent debtor, putting into his schedule the whole of his lands which had been extended under the *elegit*, the lien of the writs of *capias ad satisfaciendum* does not overreach and avoid the extent under the *elegit*. The case of Rogers *v.* Marshall, 4 Leigh, is perhaps a still stronger illustration of the extent to which the execution-lien may be affected by a junior incumbrance; as in this last case there was no intervention of a judgment, or of legal process, to operate against the execution-lien; but, in this instance, between the period of the judgment rendered and the *capias ad satisfaciendum* .executed, sundry mortgages were made by the debtor to secure debts to other creditors. It was held that, by the actual service of the *capias ad satisfaciendum* on the debtor, the lien of the judgment was destroyed, that the creditor could only stand on the lien given in the *capias* executed by the statute of 1819, sect. 10, and that, therefore, the mortgagees were entitled to precedence. The same doctrine is affirmed in the case of Leake *v.* Ferguson, as late as 1846, and reported in 2 Grattan, 419.

Upon the review here taken of the decisions of the courts in England upon the subject of judgment-lien, and of the interpretation put by the Supreme Court of Virginia upon the statutes of that State of 1748, reënacted in the revisals of 1794 and 1803, and of 1819, we are brought necessarily to the following inquiries: 1st. What lien was ever possessed by the appellant and those he represents upon the lands of M'Coull? And 2d. In what way has such lien been affected by the acts of appellant? It is certain that, on the 22d May, 1817, the appellant held a lien by judgment upon all the lands, tenements, and hereditaments of M'Coull; but it is equally certain that, by levying a *capias ad satisfaciendum* upon the body of M'Coull, in July, 1817, he released the judgment-lien upon such lands and tenements, according to the interpretation given of the statute of 1748, and also by that placed upon the statute of 1819, sect. 10. That the lien surrendered by the service of the *capias ad satisfaciendum* was never revived by the force of the former statute, inasmuch as there was neither an escape nor a dying in custody; and that no execution-lien was created by the service of

a *capias ad satisfaciendum*, and the admission of M'Coull, to the oath of an insolvent debtor, in virtue of the 10th section of the act of 1819, as that section, by express language, applies only to executions levied after the commencement of the act of 1819, and M'Coull was already in custody under an execution levied in July, 1817, more than two years anterior to the passage of that act, and under process sued out under the statute of 1748, continued in the revisals of 1794 and 1803. In truth, the oath of insolvency administered to M'Coull was not in virtue of either of the State laws above referred to, but under the act of Congress of the 6th of February, 1800, which oath of insolvency created no specific lien in favor of the appellant, and the deed to the marshal, which was neither ordered nor required by the act of Congress, could create no such specific or exclusive lien, and upon its face it purports to create none; but, on the contrary, recites that all the property of M'Coull had been conveyed by deeds previously made and recorded. The only lien by execution upon the lands of M'Coull, in virtue of the statute of 1819, sect. 10, disclosed by the record, is that of Taylor and Hay, arising from a judgment rendered in a State court of Virginia against Neil M'Coull, in April, 1821, and that lien, whatever its effect may be, must enure to the benefit of Selden, who holds an assignment of the judgment against M'Coull from the beneficiaries thereof, it being prior in date to the deed of Pegram. The lien which once existed, in virtue of the appellant's judgment, having been extinguished by the levy of the *capias ad satisfaciendum* upon the body of M'Coull, and there being no revival thereof by any of the causes known to the law, we are unable to perceive why Selden, who was a purchaser from the widow and heirs of M'Coull, might not fairly and properly obtain the legal title from Parkhill, in whom that title was vested, or get in the lien of the execution existing in favor of Hay and Taylor. By doing so, he invaded no right of the plaintiff, who had relinquished his judgment-lien, and had acquired no other under the deed to Pegram, which professes to convey to him none, and to which he was no party. Selden, having paid his money, committed no wrong on the plaintiff by drawing to himself the elder legal title outstanding in Parkhill, and by fortifying it by the execution-lien of Taylor and Hay, which clearly had precedence of the plaintiff.

After this cause had been heard in argument and taken under advisement by the Circuit Court, the plaintiff petitioned that court to permit him to file a farther bill, by way of amendment and supplement to the original bill and bill of revivor previously filed in the cause; and, after being heard by counsel upon his petition, the court refused to grant the prayer thereof, on the

grounds that the application was made at too late a period, and that the changes proposed by the plaintiff in the character of the cause would have been in reality the presenting of an entirely new case, rather than an amendment of the original bill. This refusal of the Circuit Court we hold to have been sound in principle; and it is sustained by the express language and authority of this court, in the case of Walden et al. *v.* Bodley et al., which declares that, although "there are cases where amendments may be permitted at any stage of the proceedings in the cause, as where an essential party has been omitted; yet amendments which change the character of the bill or answer, so as to make substantially a new case, should rarely, if ever, be admitted after the cause is set for hearing, much less after it has been heard." Vid. 14 Peters, 156. Moreover, a fact which imparts greater force to the refusal of the Circuit Court to permit amendment at so late a stage of the proceedings is this, that the application to that court appears to have been accompanied with no evidence, and not even by an affidavit, to show that the amendments desired could not have been made portions of the original bill; on the contrary, it is manifest, that they might have formed a part of the case as originally presented to the Circuit Court, if at any time it were proper to incorporate them with the subject-matter, and with the objects proposed by the original bill. The prayer of the original bill was limited to the enforcement of an alleged judgment-lien upon specific property purchased by the defendant, Selden, and to recourse against the heirs and widow of M'Coull, of whom Selden had purchased; the proposed change, by way of amendment and supplement, is a general bill for discovery and relief against all persons alleged or supposed to have been purchasers or grantees from M'Coull, and for satisfaction out of the property purchased by him, or to which he had title at the date of the original judgment in favor of Seekamp. Such an essential change in the character and objects of the cause, proposed, too, after a hearing, and when it was manifest that the object of the original bill, namely, — the lien of the judgment, no longer existed, could not have been accorded to the plaintiff by any sound rule of practice. On either aspect of his case, as presented by the appellant, we think that he established no ground for equitable interposition in the Circuit Court, and approving the decree of that court dismissing the bill of the appellant, we hereby order that the same be affirmed.

### *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Eastern

District of Virginia, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the Circuit Court in this cause be, and the same is hereby, affirmed, with costs.